**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**DOYLE GARVIN,**

      Plaintiff,

**v.**                                       **Civil Action No. 3:10-CV-74**
                                                     **(BAILEY)**

**WORLD COLOR PRINTING (USA) II CORP., et al.,**

      Defendants.

**MEMORANDUM OPINION AND ORDER**

Currently pending before this Court are Defendant World Color Printing (USA) II Corp.'s ("World Color") Motion for Summary Judgment [Doc. 48], filed March 11, 2011; Defendant Dan Mierzwa's Motion for Summary Judgment [Doc. 49], filed March 11, 2011; Defendant Lisa Bennett's Motion fo Summary Judgment [Doc. 52], filed March 14, 2011; and Defendant Jay Gambino's Motion for Summary Judgment [Doc. 57], filed March 22, 2011. These motions have been fully briefed and are now ripe for decision. This Court has reviewed the record and the motions and, for the reasons set out below, finds that World Color's motion should be **GRANTED IN PART** and **DENIED IN PART**, and that the other motions should be **GRANTED**.

**BACKGROUND**

**I.**    **Factual History**

This action arises from the August 29, 2008, termination of Doyle Garvin (the "plaintiff") from a book printing plant operated by a predecessor company of World Color Printing (USA) II Corp. ("World Color"). Nearly sixteen years earlier, on November 23,

1

1992, the plaintiff began working for World Color at its plant in Martinsburg, West Virginia, as a Press Operator. (Garvin Depo. at 21, 26). This position, in conjunction with the position of a Makeready, required the plaintiff to load rolls of paper into the roll stands of the printing presses. On February 7, 2008, while performing this duty, the plaintiff slipped on oil that had leaked from a printing press and injured his left knee. (Id. at 69-71, 76-77). Immediately following his fall, the plaintiff reported his injury to the stand-in Pressroom Supervisor, who transported the plaintiff to the emergency room at Jefferson Memorial Hospital in Ranson, West Virginia. (Id. at 78). At the emergency room, the plaintiff received x-rays, a wrap for his knee, prescriptions for pain medication, and crutches; the plaintiff was instructed to take three days off of work and follow up with an orthopedic surgeon in three to six days. (Id. at 81, 84).

At a staff meeting the next morning, Dan Mierzwa, vice president and general manager of World Color's Martinsburg plant, directed Catherine Wainwright, the plant's human resources manager, to send the plaintiff to Valley Health System's ("Valley Health") urgent care facility in Winchester, Virginia. (Id. at 84-85; Wainwright Depo. at 33-34; Mierzwa Depo. at 65). According to Wainwright, World Color had an agreement with Valley Health to be the exclusive provider of medical care to its employees who were injured on the job. (Wainwright Depo. at 26, 40).

Valley Health diagnosed the plaintiff with a sprained meniscus and advised that he could return to work with restrictions, e.g., that he bear no weight on his injured knee; lift no heavy weight; and refrain from climbing, kneeling, and squatting. (Valley Health Work Injury Report, at 1). The plaintiff returned to work immediately after his Valley Health visit and was placed into a light duty position repairing books. (Garvin Depo. at 91).

On February 11, 2008, the plaintiff visited Thomas W. Daugherty, M.D., an orthopedic surgeon at Bone & Joint Specialists of Winchester, P.C. (Id. at Ex. 13). Like the physician at Valley Health, Dr. Daugherty diagnosed the plaintiff with a sprained knee and recommended that he return to work the next day with similar restrictions. (Id.). The plaintiff returned to work in same light duty position. (Id. at 97).

At the beginning of April 2008, Dr. Daugherty performed surgery to repair the plaintiff's knee. (Id. at 104). On April 8, 2008, Dr. Daugherty recommended that the plaintiff not return to work until reevaluated, noting that the plaintiff should undergo physical training to rehabilitate his knee. (Id. at Ex. 14). Nevertheless, the plaintiff immediately returned to work and was placed in the Human Resources Department to do clerical work. (Id. at 106).[1] On April 29, 2008, Dr. Daugherty recommended that the plaintiff continue to work with the same pre-surgery restrictions. (Id. at Ex. 15). The plaintiff received the same recommendations on May 20, 2008, and June 17, 2008. (Id. at 111-112). Again, on July 15, 2008, Dr. Daugherty issued the same recommendation, except that he upgraded the plaintiff from "sedentary work" to "light work" and noted that the plaintiff was permanently restricted from kneeling or crawling. (Id. at 113, 115). As such, the plaintiff was permanently unable to return to his pre-injury position of Press Operator. (Id. at 115).

After his July 2008 visit, the plaintiff was placed in another light duty position filing paper work for the Press Room. (Id. at 116-117). At the same time, Mierzwa directed Wainwright and Donny Faircloth, supervisor in the Pre-Press Department, to search for an

---

[1]At his deposition, the plaintiff stated that he had no recollection of Dr. Daugherty's recommendation not to return to work. (Garvin Depo. at 104-106). The plaintiff also emphasized that World Color was "accommodating" him by "giving [him] light duty." (Id. at 105).

appropriate accommodation for the plaintiff.  (Mierzwa Depo. at 29-30; Wainwright Depo. at 53).  Based upon a review of the jobs at the plant, Wainwright and Faircloth determined that Platemaker, a job in the Pre-Press Department, was the only position that could be adjusted to fit the plaintiff's restrictions.  (Wainwright Depo. at 62, 75, 102).  The position of Platemaker, which consisted of generating plates and processing film, required approximately six months of training, according to Faircloth.  (Id. at Ex. 18; Mierzwa Depo. at 38, 78, 116-117).  At the time, the position was occupied by a temporary employee named Michael Kenny, who had been trained for the job earlier in 2008.  (Mierzwa Depo. 32-33, 142-143).  Nevertheless, Mierzwa was willing to replace Kenny with the plaintiff, assuming he was physically capable to perform the job.

On July 21, 2008, Mierzwa wrote an e-mail to Lisa Bennett, vice president of human resources, and Jay Gambino, workers' compensation and insurance manager, describing the process:

> Because of Doyle's good performance history, attitude, and years of service, HR has taken the initiative to go back to re-examine the physical requirements of a number of jobs to see if any of them could be adjusted to meet Mr. Garvin's restrictions by modifying the methods of how the job is done.  The one job classification that offers this opportunity is that of platemaker.
>
> Although the platemaker position job description has a physical requirement of lifting containers of plate processing solution weighing upwards of fifty (50) lbs., the use of a hand activated bump in conjunction with changes in material handling techniques and storage could potentially result in a job classification with requirements that would meet Mr. Garvin's restrictions as well as improve the ergonomics of the job for all other platemakers.
>
> The task of bending the plates themselves requires some physical exertion that would have to be evaluated to determine if they were in Mr. Garvin's capabilities.  If they are, a temp currently working in a platemaker's position would be replaced by Mr. Garvin.

(Wainwright Depo. at Ex. 5).

Garvin expressed interest in this solution, and the Platemaker job description was sent to Dr. Daugherty, who approved it on August 21, 2008. (Garvin Depo. at 127-128, Ex. 20; Wainwright Depo. at 62, 64, Ex. 2). Nevertheless, after conference call with Gambino and Bennett to discuss a potential shift reduction, Mierzwa directed Wainwright to inform the plaintiff that the job was unavailable and that he would be terminated. (Wainwright Depo. at 124-126; Bennett Depo. at 53-54). On August 29, 2008, Wainwright did as directed. (Garvin Depo. at 28).

On October 15, 2008, World Color announced a shift reduction from four to three shifts. (Mierzwa Depo. at 121-122, Ex. 1). Layoffs caused by the shift reduction were made effective on November 2, 2008. (Id.).

## II.  Procedural History

On July 6, 2010, the plaintiff commenced this action in the Circuit Court of Berkeley County, West Virginia, against World Color, Mierzwa, Bennett, and Gambino. The Complaint [Doc. 1-3] contained three causes of action: (Count I) civil conspiracy to wrongfully discharge; (Count II) failure to reasonably accommodate a disability in violation of the West Virginia Human Rights Act ("WVHRA"), W.Va. Code § 5-11-1, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112-12117; and (Count III) disparate treatment in violation of the WVHRA and the ADA. On August 11, 2010, the defendants removed the above-styled action to the United States District Court for the Northern District of West Virginia based upon diversity jurisdiction [Doc. 1].

On September 15, 2010, the plaintiff filed a First Amended Complaint ("FAC") [Doc. 8], deleting his ADA claim and adding allegations that Mierzwa, Bennett, and Gambino

5

acted outside the scope of their authority, and thus, are capable of forming a conspiracy to wrongfully discharge the plaintiff. On October 6, 2010, World Color and Mierzwa filed a timely Answer [Doc. 18], denying, *inter alia*, the plaintiff's allegations of conspiracy. The other two defendants, Gambino and Bennett, moved to dismiss the FAC on December 6, 2010, and February 10, 2011, respectively [Docs. 26 & 37]. In support of their dismissal, Gambino and Bennett argued that they acted within the scopes of their employment and were therefore incapable of forming a conspiracy with their corporate employer. In rejecting their argument, this Court found that the plaintiff had adequately alleged that Gambino, Bennett, and Mierzwa acted "[o]n their own" and "without the authority of [World Color]." ([Doc. 40] at 6-7; [Doc. 42] at 7).

After the close of discovery on March 1, 2011, the above-named defendants moved for summary judgment [Docs. 48, 49, 52, & 57]. A pretrial conference is currently scheduled for May 6, 2011, to be followed by a jury trial on May 17, 2011 [Doc. 12].

**DISCUSSION**

**I.     Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 250 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial-- whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

## II.    Analysis

In their motions, the defendants argue that they are entitled to summary judgment on all three of the plaintiff's counts, while the plaintiff argues that he has presented genuine issues of material fact which preclude summary judgment on any count. Below, the Court will consider each count, in turn.

### B.    Count I: Civil Conspiracy to Wrongfully Discharge

In Count I, the plaintiff alleges that the defendants: (1) "along with [Valley Health] and Winchester Medical Center approved of and oversaw a conspiracy to systematically manipulate the West Virginia workers compensation system to minimize 'lost time accidents' and cause workers to use their vacation benefits while recuperating from workplace injuries;" (2) "engaged in a policy of eliminating disabled employees from its ranks by refusing to accommodate disabled workers . . .;" and (3) "[o]n their own, Defendants Dan Mierzwa, Jay Gambino, and Lisa Bennett, engaged in a conspiracy to

eliminate disabled employees by refusing to accommodate . . . the Plaintiff in violation of law and public policy and in contravention of the policy of, and without the authority of [World Color]."[2] ([Doc. 8] at ¶¶ 41-43).

In their motions, the defendants argue that this civil conspiracy claim should be dismissed based upon the intracorporate conspiracy doctrine and because its allegations are duplicative of the plaintiff's WVHRA claims.

### 1.    Civil Conspiracy vs. Intracorporate Conspiracy Doctrine

In West Virginia, "[a] civil conspiracy is not a *per se*, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." ***Dunn v. Rockwell***, 225 W.Va. 43, 57, 689 S.E.2d 255, 269 (2009) (citing ***Kessel v. Leavitt***, 204 W.Va. 95, 129, 511 S.E.2d 720, 754 (1998)).  Here, for example, the plaintiff's conspiracy claim is primarily based upon the underlying tort of wrongful discharge.  (See [Doc. 8] at ¶¶ 41-43).

However, "[u]nder the intra-corporate [conspiracy] doctrine, . . . a corporation cannot conspire with its own officers while the officers are acting in their official capacity." ***United States ex. rel. DRC, Inc. v. Custer Battles, LLC***, 376 F.Supp.2d 617, 651 (E.D. Va. 2005) (quotation and footnote omitted).  "Simply joining corporate officers as defendants in their official capacities is not enough to make them persons separate from the corporation in legal contemplation." ***Buschi v. Kirven***, 775 F.2d 1240, 1252 (4th Cir. 1985) (quoting ***Cole***

---

[2]In response to World Color's motion for summary judgment, the plaintiff stipulates to the dismissal of the "constructive discharge" portion of Count I.  ([Doc. 61] at 5). Accordingly, the Court's list of the allegations in Count I has been amended to account for the plaintiff's stipulation.

*v. Univ. of Hartford*, 391 F.Supp. 888, 893 (D. Conn. 1975)). "The rationale for the doctrine is that since the acts of a corporate agent are the acts of the corporation, a conspiracy among the agents of the corporation, or among an agent and the corporation, is in effect a conspiracy with only one actor – the corporation. *United States v. Gwinn*, 2008 WL 867927, *21 (S.D. W.Va. Mar. 31, 2008) (citing *Buschi*, 775 F.2d at 1251-54). Although the doctrine originated in an antitrust case, the Fourth Circuit has held that the doctrine is generally applicable to conspiracy actions, including to state civil conspiracy claims. *Id.* at 23 (citing *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179-80 (4th Cir. 2002).

Nevertheless, "[t]he Fourth Circuit has recognized two exceptions to the general rule that agents of a principal cannot conspire with one another or the principal: [1] the so-called 'independent personal stake' exception, and [2] where the corporate agents are alleged to have acted outside the normal course of their corporate duties – the 'unauthorized acts' exception." *Id.* at *25 (citing *Hodgin v. Jefferson*, 447 F.Supp. 804, 807 (D. Md. 1978); *Buschi*, 775 F.2d at 1252-53; *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974)). The Court will consider the applicability of each exception below, beginning with the second.

### i.     "Unauthorized Acts" Exception

Paragraph 43 of the FAC alleges that Mierzwa, Bennett, and Gambino acted "[o]n their own" and "without the authority of [World Color]" in connection with the plaintiff's accommodation and termination. ([Doc. 8] at ¶ 43). Based upon these allegations, this Court found that the plaintiff had sufficiently pled the "unauthorized acts" exception to survive a 12(b)(6) motion. ([Doc. 40] at 6-7; [Doc. 42] at 7). Now, the defendants argue that they are entitled to summary dismissal because the plaintiff has failed to present a

genuine issue of material fact to support their allegations. This Court agrees.

The "unauthorized acts" exception requires that the agents "acted outside the scope of their employment." **Gwinn**, 2008 WL 867927 at *25. Here, the plaintiff argues that it could not have been within Mierzwa's, Bennett's, or Gambino's scopes of employment to refuse to accommodate and ultimately wrongfully discharge him. However, in West Virginia, "'scope of employment' is a relative term and requires a consideration of surrounding circumstances, including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the purpose of the act. In general terms, it may be said that an act is within the course of the employment, if (1) It is something fairly and naturally incident to the business and (2) it is done while the servant was engaged upon the master's business and is done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and [3] did not arise wholly from some external, independent and personal motive on the part of the servant to do the act upon his own account." **Foodland v. State ex rel. WV DHHR**, 207 W.Va. 392, 396, 532 S.E.2d 661, 665 (2000); *see also* **LeRose v. United States**, 285 Fed.Appx. 93, 97-98 (4th Cir. 2008).

In applying the **Foodland** standard, this Court emphasizes that the standard, as articulated, accounts for the possibility that an agent's conduct was "mistaken," "ill-advised." or even "wrongful." As such, those factors are not dispositive. Rather, this Court will consider the other surrounding circumstances, including whether the act was incident to the principal's business.

With regard to Mierzwa, it cannot be disputed that his decisions to issue the Valley

Health policy, plan for accommodating the plaintiff with the Platemaker position by modifying the requirements, reduce the plant's shifts from four to three, and ultimately terminate the plaintiff were "fairly and naturally incident" to World Color's business. As vice president and general manager of World Color, these decisions were also unquestionably within Mierzwa's authority and responsibilities, even if "mistakenly," "ill-advisedly" or "wrongfully" made in an effort to reduce "lost-time" accidents.[3] Finally, these decisions were undisputedly made "with a view to further" World Color's interests, and as will be more fully discussed below, "did not arise wholly from some external, independent and personal motive" on Mierzwa's part.

As for Bennett and Gambino, this Court finds that their involvement was also within the scopes of their employment. In providing advice regarding the plaintiff's accommodation in light of a potential shift reduction, Bennett and Gambino acted within their respective authority and responsibilities as vice president of human resources and workers' compensation and insurance manager. That their advice may have been "mistaken," "ill-advised," or "wrongful" is not dispositive. Finally, as explained below, the advice given was not based wholly upon any personal motive.

Therefore, this Court finds that the plaintiff has failed to present a genuine issue of material fact that the "unauthorized acts" exception to the intracorporate conspiracy doctrine applies.

---

[3]In his briefs, the plaintiff primarily relies upon an allegation that he was terminated in retaliation for filing a workers' compensation claim to argue that Mierzwa, Bennett, and Gambino acted outside the scopes of their employment. However, because this allegation can be found nowhere in the FAC, this Court will not consider the claim in determining whether the individual defendants acted outside the scopes of their employment.

## ii.     "Independent Personal Stake" Exception

To further rebut the "unauthorized acts" exception, the individual defendants state that their bonuses were dependent upon reducing "lost-time" accidents, and thus, that they were acting within the scopes of their employment. However, an employee's pursuit of a bonus, without more, does not satisfy the "independent personal stake" exception.

"Under the 'independent personal stake' exception, the agent must have a personal interest in the illegal activity 'wholly separable' and independent of his relationship with the corporation." *Gwinn*, 2008 WL 867927 at *25 (citing *Douty v. Irwin Mortgage Corp.*, 70 F.Supp.2d 626, 633 (E.D. Va. 1999) (quoting *Selman v. Am. Sports Underwriters, Inc.*, 697 F.Supp. 225, 239 (W.D. Va. 1988)). "Where a corporation's success is directly dependent on the agent's success in furthering the illegal activity, the two are directly related and are not 'wholly independent' of one another. If one benefits, so will the other." *Id.*

Applying these principles to this case, if the individual defendants reduced "lost-time" accidents, both they and World Color benefitted. "There success was intertwined and not wholly independent." *Id.* at *26. The fewer "lost-time" accidents permitted, the plant would receive a better safety rating, and consequently, the individual defendants would be more likely to receive bonuses. "Thus, as is the case here, when an agent of a corporation is working within the scope of his employment and acts in a manner that benefits both himself and his corporation for similar reasons, the narrow 'independent personal stake' exception is not applicable." *Id.*

Accordingly, because the intracorporate conspiracy doctrine applies to a state civil law conspiracy, and because neither exceptions apply, the individual defendants' motions

should be **GRANTED**.  As such, Defendants Mierzwa, Bennett, and Gambino should be **DISMISSED** not only from liability under the civil conspiracy claim in Count I but also from liability under the WVHRA claims in Counts II and III, to the extent they rely upon a conspiracy theory.

### 2.    Exclusive Provider Agreement with Valley Health

Paragraph 41 of the FAC claims that World Color "along with [Valley Health] and Winchester Medical Center approved of and oversaw a conspiracy to systematically manipulate the West Virginia workers compensation system to minimize 'lost time accidents' and cause workers to use their vacation benefits while recuperating from workplace injuries."  ([Doc. 8] at ¶ 41).  In support of this claim, the plaintiff alleges that "[World Color's] requirement that all employees use [its] hand-selected doctors in Winchester, Virginia" was in violation of the West Virginia Workers' Compensation Act, W.Va. Code § 23-4-3(b)(1), which prohibits employers from entering into exclusive agreements with a health care provider to treat its employees' work injuries.  (Id. at ¶ 21).

In its motion, World Color argues that section 23-4-3(b) does not create a private cause of action and that there is no connection between the plaintiff's visit to Valley Health in February 2008 and his termination in August 2008.  The plaintiff responds that World Color "mistakenly assume[s] that [he] relies on [section 23-4-3(b)] as a theory of recovery." ([Doc. 61] at 9).  "In fact," the plaintiff explains, "[he] cites the statute as evidence for the fact that the actions of the [individual] Defendants in concert were illegal, and therefore outside the scope of their duties."  (Id.).  In reply, World Color states its clarified understanding that "the alleged violation of W.Va. Code § 23-4-3(b)(1) is raised only as a way to show that the individual Defendants cannot take advantage of the intra-corporate

[conspiracy] doctrine as a defense to the civil conspiracy claim." ([Doc. 77] at 2-3).

Therefore, to the extent that this Court has already applied the intracorporate conspiracy doctrine above, the plaintiff's only purpose for including the allegation regarding World Color's exclusive provider agreement with Valley Health is no longer viable. Accordingly, Count I should be **DISMISSED** to the extent it relies upon the exclusive provider agreement between World Color and Valley Health.

### 3. Common Law vs. WVHRA

Finally, World Color argues that the WVHRA provides the exclusive remedy for the remaining allegations in Count I, namely that World Color failed to accommodate and eventually wrongfully terminated the plaintiff.[4] (See [Doc. 8] at ¶¶ 42-43). This Court agrees.

In West Virginia, "[a] victim of unlawful discrimination is limited to the remedy afforded him under the West Virginia Human Rights Act . . .." *Burgess v. Gateway Commc'ns-WOWK TV*, 984 F.Supp. 980, 983 (S.D. W.Va. 1997) (citing *Knox v. Wheeling-Pittsburgh Steel Corp.*, 899 F.Supp. 1529, 1535-36 (S.D. W.Va. 1995); *Taylor v. City Nat'l Bank*, 642 F.Supp. 989, 998 (S.D. W.Va. 1986); *Guevara v. K-Mart Corp.*, 629 F.Supp. 1189, 1292 (S.D. W.Va. 1986)). In *Burgess*, because the plaintiff had pled discrimination under the WVHRA, the court dismissed his claim for wrongful discharge. Likewise, because the plaintiff here has pled failure to accommodate and wrongful

---

[4]The plaintiff argues extensively in his briefs that he has alleged a violation of W.Va. Code § 23-5A-1, which prohibits an employer from retaliating against an employee for filing a workers' compensation claim, and that this allegation saves Count I from being dismissed as duplicative of his WVHRA claims. Again, nowhere in the FAC does the plaintiff indicate that he is claiming a violation of section 23-5A-1. As such, this Court will not consider this newly-raised allegation in determining whether Count I is duplicative of Counts II and III.

discharge under the WVHRA, his equivalent common law claims cannot proceed. Accordingly, Count I should be **DISMISSED**.

### C.     Count II:  WVHRA – Failure to Accommodate

In Count II, the plaintiff claims that World Color violated the WVHRA because it "knew of [his] need for an accommodation, and the existence of an accommodation, but refused to provide [him] the accommodation." ([Doc. 8] at ¶ 60).  In support of this claim, the plaintiff alleges that World Color had a duty to give him a temporary employee's Platemaker position, which his doctor had approved as a proper accommodation.  (See Id. at ¶¶ 49-54).  World Color counters that the Platemaker position was not a reasonable accommodation for two reasons, namely: (1) the position was not vacant and (2) the position required six months of training.

"[T]he West Virginia Human Rights Commission and [the Supreme Court of Appeals of West Virginia] have inferred that [the WVHRA] imposes [a] duty of reasonable accommodation," i.e., "an affirmative obligation [on employers] to provide reasonable accommodation for disabled individuals." **Skaggs v. Elk Run Coal Co.**, 198 W.Va. 51, 64, 479 S.E.2d 561, 574 (1996).  "To state a claim for breach of that duty, a plaintiff may prove the following elements: (1) The plaintiff is a qualified person with a disability; (2) The employer was aware of the plaintiff's disability; (3) The plaintiff required an accommodation in order to perform the essential functions of the job; (4) A reasonable accommodation existed that would meet the plaintiff's needs; (5) The employer knew or should have known of the plaintiff's needs and of the accommodation; and (6) The employer failed to provide the accommodation." **Id.** at 575 (footnotes omitted).

Only the first and fourth elements are seriously in dispute between the parties, i.e.,

whether the plaintiff was disabled and whether there existed a reasonable accommodation. As such, this Court will now consider whether the plaintiff has successfully presented a genuine issue of material fact on each element.

### 1. Qualified Person with a Disability

The plaintiff argues that he has presented a genuine issue of material fact that he was disabled pursuant to the WVHRA based upon World Color regarding him as disabled. This Court agrees.

"The term 'disability' means, *inter alia*, '[a] mental or physical impairment which substantially limits one or more of such person's major life activities,' including 'caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working,' *or* '[b]eing regarded as having such an impairment.' [W.Va. Code] § 5-11-3(m)(1), (3)." ***Calef v. FedEx Ground Packaging Sys.***, 343 Fed.Appx. 891, 896-97 (4th Cir. 2009) (emphasis added). An employee is "regarded as" disabled under the WVHRA if his employer treats him "as a person who should not be entrusted with the duties of his regular job." *See* ***Stone v. St. Joseph's Hosp. of Parkersburg***, 208 W.Va. 91, 108, 538 S.E.2d 389, 406 (2000); *see also* ***Calef***, 343 Fed.Appx. at 897. As the court in ***Stone*** explained, the WVHRA "protects persons who are discriminatorily *treated* as having a substantially limiting impairment," and that "[t]his component of the Act's prohibitions is an objective test that does not focus on the subjective motivation behind the behavior in question, but on the behavior itself." ***Stone***, 538 S.E.2d at 407 n. 25 (emphasis in original).

Here, the plaintiff cites deposition testimony of Wainwright, Bennett, and Mierzwa to establish that World Color regarded him as disabled. ([Doc. 61] at 11). For example, Wainwright testified that the plaintiff's injury prevented him from returning to his pre-injury

position of Press Operator, and as a result, World Color had the plaintiff placed into other light work positions. (Wainwright Depo. at 48-49). Next, Bennett testified that the plaintiff was terminated because "there was no vacancy for him to be employed in, based on his permanent restrictions." (Bennett Depo. at 52). Finally, Mierzwa testified that the plaintiff was unable to return to his previous position because of a permanent injury and agreed that World Color had an obligation to accommodate the plaintiff's injury. (Mierzwa Depo. at 28-29). Viewing this evidence in its most favorable light, this Court finds that the plaintiff has successfully presented a genuine issue of material fact that World Color regarded him as disabled.

## 2.    Existence of Reasonable Accommodation

The plaintiff argues that he has presented genuine issues of material fact that the Platemaker position held by the temporary employee existed as a reasonable accommodation that would meet his needs. More specifically, the plaintiff argues that: (1) the position was vacant and (2) he could have feasibly been trained for the position. The Court will now consider each argument, in turn.

### i.    Vacancy

An example of a reasonable accommodation includes "reassigning the employee to a vacant position for which the person is able and competent . . . to perform[.]" *Skaggs*, 479 S.E.2d at 576 (citation omitted). However, "an employer [does not] have a duty to displace other employees in order to accommodate a disabled employee." *Id.* at 577.[5]

_____

[5]In support of its argument that a position held by a temporary employee is not "vacant," World Color cites *Duvall v. Georgia-Pacific Consumer Products, L.P.*, 607 F.3d 1255, 1262 (10th Cir. 2010), which held that "a position is 'vacant' with respect to a disabled employee for purposes of the ADA if it would be available for a similarly-situated

Nevertheless, "[the WVHRA] dictates that decisions must be made on a case-by-case basis" and "flexibility and common sense must guide decisionmaking." *Id.* at 575 n. 11, 579.

In the instant case, World Color's policy was to use temporary workers "only in excess of [its] normal pool of hourly and salaried employees in the facility" or to "staff to normalcy." (Gambino Depo. at 32; Bennett Depo. at 84). In fact, Mierzwa sent Bennett, Gambino, and Wainwright an e-mail specifically stating that, if the Platemaker position was within the plaintiff's physical capabilities, "a temp currently working in a platemaker's position would be replaced by Mr. Garvin." (Wainwright Depo. at Ex. 5). Viewing this evidence in its most favorable light, this Court finds that the plaintiff has successfully presented a genuine issue of material fact that World Color considered the Platemaker position held by the temporary employee to be "vacant" for purposes of accommodation.

### ii.    Training

Reassignment to a vacant position is a reasonable accommodation only if the employee is "able and competent . . . to perform" the essential functions of that position. *Skaggs*, 479 S.E.2d at 576. The phrase "able and competent" means that, "with or without reasonable accommodation, an individual is currently capable of performing the work . . .." W.Va. C.S.R. § 77-1-4.3 (emphasis added). However, the Supreme Court of Appeals has

---

non-disabled employee to apply for and obtain." In this Court's opinion, *Duvall* is not dispositive for at least two reasons. First, the Supreme Court of Appeals of West Virginia once explained that the WVHRA "represents an independent approach that is not mechanically tied to federal disability discrimination jurisprudence." *See Stone*, 538 S.E.2d at 404. Second, *Duvall* is factually distinguishable because "[t]he undisputed evidence was that [the employer's] business plan was to occupy [the positions at issue] exclusively with . . . contract employees." *Duvall*, 607 F.3d at 1263-64.

at least once rejected a literal application of the phrase "currently capable of performing."

For example, the court in **Haynes v. Rhone-Poulenc, Inc.**, 206 W.Va. 18, 19-34 521 S.E.2d 331, 339-344 (1999) rejected an employer's argument that a temporary leave of absence before starting an accommodated position made an employee not "currently capable of performing" and thus not within the protection of the WVHRA. Specifically, the court found it "difficult to find coherence, common sense, or persuasive force in a legal position that would strip the protection of the law against disability discrimination from an employee with a disability that requires the employee to miss work for a week – or indeed, logically extended, even for a day!" **Id.** at 341. To hold otherwise, the court noted, "would be to abandon . . . flexibility, and to undermine the intent of the [WVHRA]." **Id.** at 344.

Similar to the employer in **Haynes**, World Color argues that the plaintiff was not "currently capable" of performing as a Platemaker solely because the position required training, no matter the length. The plaintiff responds with an affidavit in which Wainwright states that the position had no set training period and a copy of the job description which also fails to mention any training requirements [Docs. 61-9 & 61-10]. In fact, according to Wainwright's deposition testimony, the plaintiff's potential supervisor as Platemaker "was very receptive because of [the plaintiff] apparently having this very keen photography background." (Wainwright Depo. at 53). Viewing this evidence in its most favorable light, this Court finds that the plaintiff has presented a genuine issue of material fact that he was "able and competent" to perform the job of Platemaker. Accordingly, Count II **MAY PROCEED**.

### D.      Count III: WVHRA – Disparate Treatment

In Count III, the plaintiff claims that his termination, after World Color refused to

reasonably accommodate him, constituted disparate treatment under the WVHRA because the termination was based upon his disability. ([Doc. 8] at ¶¶ 63-64).

To establish a prima facie case of disparate treatment under the WVHRA, an employee must establish that: (1) he was disabled or regarded as disabled on the date in question; (2) he was competent and able to perform the essential functions of his job, or he could have performed those functions with reasonable accommodation, which the employer failed to provide; and (3) the employer took an adverse employment action against him. *Calef*, 343 Fed.Appx. at 898-99. Upon proving a prima facie case, and the employer's articulation of a "legitimate, nondiscriminatory reason for its actions," an employee must establish that the employer's articulated reason for its adverse employment action against him was "a pretext for unlawful disability discrimination." *Id.* (quoting *Skaggs*, 479 S.E.2d at 582). The Court will now consider each step of the analysis, in turn.

### 1. Prima Facie Case

World Color does not dispute that its termination of the plaintiff was an adverse employment action. Moreover, as determined above, the plaintiff has successfully presented genuine issues of material fact as to whether World Color regarded the plaintiff as disabled and whether World Color failed to accommodate the plaintiff. Accordingly, the plaintiff has adequately established a prima facie case. To proceed on his disparate treatment claim, however, the plaintiff must present a genuine issue of material fact sufficient for a reasonable juror to find that World Color's articulated non-discriminatory reason for terminating the plaintiff was a pretext for unlawful disability discrimination.

### 2. Pretext

World Color argues that it terminated the plaintiff's employment because: (1) he was

not qualified to return to his pre-injury job; (2) there were no vacant jobs to which he could be reassigned within his restrictions; and (3) at the time of the plaintiff's termination, World Color knew that because of a potential bankruptcy the plant would be reducing shifts and thus eliminating one of the Platemaker positions.

"To get to the jury, the employee must offer sufficient evidence that the employer's explanation was pretextual to create an issue of fact. If the employer has met its burden of production and the employee offers evidence of pretext, the trier of fact proceeds to decide the ultimate question, i.e., whether the adverse employment action taken against the plaintiff was the result of a forbidden motive." **Skaggs**, 479 S.E.2d at 583.

In claiming pretext, the plaintiff asserts that the third reason[6] for his termination is "a *post hoc* argument with absolutely no foundation in the contemporaneous evidence." ([Doc. 61] at 16).[7] Specifically, the plaintiff emphasizes that "[n]owhere in their communications or conversations do the Defendants reference the bankruptcy or any subsequent reductions in force as a reason for [his] termination." (Id.). The plaintiff also cites Wainwright's affidavit wherein she states that "[a]t no time during discussion of placing Mr. Garvin in a Platemaker position did any individual refer to potential or impending bankruptcy as a reason for denying him that position" and that "[a]t the time Mr. Garvin

_____

[6]Moreover, the Court notes that the plaintiff has already established that there are genuine issues of fact surrounding World Color's second reason for the plaintiff's termination. There are no genuine issues with regard to the first, however.

[7]Once more, the plaintiff attempts to rely upon an allegation of retaliation in response to the defendants' motions. This time, the plaintiff alleges that World Color's articulated reasons for his termination are pretext because the termination was, in fact, retaliation for his filing a workers' compensation claim. However, because the FAC fails to allege such a claim, this Court disregards that allegation in its analysis of pretext.

was terminated, there was no discussion of cutting the Platemaker positions from four to three." ([Doc. 61-9] at ¶¶ 10-11). Viewing this evidence in its most favorable light, this Court finds that the plaintiff has presented a genuine issue of material fact that World Color's articulated non-discriminatory reason for terminating him was a pretext for unlawful disability discrimination. Accordingly, Count III **MAY PROCEED**.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendant World Color's Motion for Summary Judgment **[Doc. 48]** should be, and hereby is, **GRANTED IN PART** and **DENIED IN PART**. Accordingly, Count I is hereby **DISMISSED**, and Counts II and III **MAY PROCEED**. In addition, the Court finds that Defendants Mierzwa's, Bennett's, and Gambino's Motions for Summary Judgment **[Docs. 49, 52, & 57]** should be, and hereby are, **GRANTED**. Accordingly, Defendants Mierzwa, Bennett, and Gambino are hereby **DISMISSED WITH PREJUDICE**.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record.

**DATED**: April 19, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE